RECEIVED

AUG 1 9 2016

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT                                    b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

EDWARD CHARLES MCCALL            CIVIL ACTION NO. 1:15-CV-00164

VERSUS                                         JUDGE TRIMBLE

U.S. COMMISSIONER OF                 MAGISTRATE JUDGE PEREZ-MONTES
SOCIAL SECURITY

---

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Edward Charles McCall ("McCall") filed an application for Social Security
Disability Insurance Benefits ("DIB") on January 8, 2009 (Doc. 7-1, p. 307/483),
alleging a disability onset date of October 1, 2008 (Doc. 7-1, pp. 364, 368/483) due to
"headaches, depression, shortness [sic] of breath, back pain, fatigue, forgetful,
nervous, mood swings, paranoid, denial, anxiety, withdrawal, post-traumatic stress,
HBP" (Doc. 7-1, p. 368/483).   McCall's claim was denied by the Social Security
Administration ("SSA") on March 30, 2009 (Doc. 7-1, p. 171/483).

A de novo hearing was held on January 19, 2010 before an administrative law
judge ("ALJ") (Doc. 7-1, pp. 44-63/483), at which McCall appeared (unrepresented)
with a vocational expert ("VE") and a medical expert ("ME").   The ALJ found that
McCall had severe impairments of degenerative joint disease of the lumbar spine
without radiculopathy and alcoholism, currently abstaining (Doc. 7-1, p. 128/483).
The ALJ also concluded McCall was able to perform his past relevant work as a bus
driver, truck driver, P.E. teacher, and vocational technical instructor, and McCall

was disabled at any time from October 1, 2008, his alleged onset date, through September 30, 2009, the date last insured for DIB (Doc. 7-1, pp. 133-34/483).

The Appeals Council reviewed McCall's claim and found the hearing decision did not adequately evaluate either Dr. Hartwell's opinion or McCall's mental impairments (Doc. 7-1, p. 139/483).  On September 17, 2010, the Appeals Council remanded McCall's case to the ALJ to further consider his maximum residual functional capacity and expand the record if necessary (Doc. 7-1, pp. 139-140/483).

A second de novo hearing was held on July 25, 2011 before an ALJ, at which McCall appeared with his attorney and a VE (Doc. 7-1, pp. 71-93/483).  The ALJ found that, since the amended disability onset date of November 4, 2010, McCall suffered from severe impairments of degenerative disc disease of the lumbar spine with lumbar stenosis of L3-4 and depression, and that, beginning on the established disability onset date of April 14, 2011, McCall suffered from depression, degenerative disc disease of the lumbar spine with lumbar stenosis of L3-4, cervical myelopathy, and bilateral hand numbness (Doc. 7-2, p. 148/483).  The ALJ amended the alleged onset date to November 4, 2010, and found McCall was not disabled because he could perform a modified range of light work and a full range of sedentary work, and could work as a bakery conveyor worker or a blending tank tender (production worker helper) (Doc. 7-1, pp. 151-56/483).  The ALJ concluded that McCall was not disabled prior to April 14, 2011, but was disabled, for purposes of Medicare only, from April 14, 2011 through the date of his decision on September 9, 2011 (Doc. 7-1, pp. 151-56/483).

The Appeals Council again reviewed McCall's appeal and remanded his case for further consideration of: (1) McCall's date last insured and amended onset date; (2) the limiting effects of the ambulatory assistive device on McCall's maximum residual functional capacity; (3) the effects of his mental limitations on his residual functional capacity; (4) Dr. Hartwell's opinion; (5) eliminating improper consideration of the fact that McCall receives unemployment benefits; (6) McCall's subjective complaints and residual functional capacity; and (7) expanding the record if necessary with evidence from a medical expert (to clarify onset dates) and a vocational expert (Doc. 7-1, pp. 165-167/483).

A third de novo hearing was held on June 25, 2013 before an ALJ, at which McCall appeared with his attorney and a VE (Doc. 7-1, pp. 94-118/483). The ALJ denied McCall's claim for benefits (Doc. 7-1, p. 36/483). The ALJ found that McCall last met the insured status requirement for DIB on September 30, 2009; he engaged in an unsuccessful work attempt from July through November 2010; and he engaged in substantial gainful activity from May 2012 to June 2013 (Doc. 7-1, p. 25/483). The ALJ found that McCall has severe impairments of degenerative disc disease of the cervical and lumbar spines, lumbar stenosis at L3-4, cervical myelopathy, depression, and post-traumatic stress disorder (Doc. 7-1, p. 26-27/483). The ALJ further found that McCall is unable to perform any of his past relevant work, but has the residual functional capacity to perform a modified range of light work (Doc. 7-1, pp. 29, 34/483), and there are jobs that exist in significant numbers in the national economy that McCall could have done, such as weigh scale operator or hand-packager (Doc.

701, p. 35/483). The ALJ concluded that McCall was not disabled as defined in the Social Security Act at any time from May 6, 2009 (the amended alleged onset date) through September 30, 2009 (the date last insured for DIB) or, for purposes of Medicare Insurance Benefits, through the date of his decision on December 16, 2013 (Doc. 7-1, pp. 35-36/483).

The Appeals Council declined to review the ALJ's decision (Doc. 7-1, p. 8/483) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

McCall next filed this appeal for judicial review of the Commissioner's decision. The sole issue raised by McCall for review on appeal is whether the ALJ erred in his construction of the Residual Functional Capacity ("RFC") by not adding evidence of McCall's mental limitations as documented through the Veteran Administration's determination that McCall suffers from Post-Traumatic Stress Disorder[1] and is 100%

---

[1] Posttraumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity or witnessing an event that involves death, injury, or a threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member or other close associate (Criterion A1). The person's response to the event must involve intense fear, helplessness, or horror (Criterion A2). The characteristic symptoms resulting from the exposure to the extreme trauma include persistent re-experiencing of the traumatic event (Criterion B), persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (Criterion C), and persistent symptoms of increased arousal (Criterion D). The full symptom picture must be present for more than 1 month (Criterion E), and the disturbance must cause clinically significant distress or impairment in social, occupational, or other important areas of functioning (Criterion F). See American

4

disabled (Doc. 10). McCall states in his brief that only the third administrative hearing is relevant to his appeal (Doc. 10, p. 4/10). The Commissioner filed a brief in response to McCall's appeal (Doc. 11), to which McCall replied (Doc. 12). McCall's appeal is now before the Court for disposition.

Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be disabled as defined by the Social Security Act. See 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than 12 months. See 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. See 42 U.S.C. 423(d)(2).

Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal

---

Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders Text Revision, § 309.81 (4th ed. 2000) ("DSM-IV-TR").

errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

Summary of Pertinent Facts

### 1. Medical Records

McCall's first treatment for alcohol abuse at the VA Medical Center was in 1999, when he received his first DUI (Doc. 7-2, p. 776-793). McCall also had problems with alcohol abuse in February 2007 and November 2007 (Doc. 702, p. 3/793).

In December 2008, McCall was again abusing alcohol, had an alcohol-induced mood disorder, was overwhelmed by problems with impending legal and domestic issues, and cried uncontrollably (Doc. 7-2, pp. 9-10, 23/793). McCall was admitted to the acute psychiatric ward of the VA Medical Center for alcohol abuse, stress, depression, and suicidal ideation on December 21, 2008, and reported that he had been in jail from September 14-December 5, 2008 for aggravated assault (Doc. 7-2, pp. 12-13/793). McCall complained of sleep impairment, forgetfulness, and mood swings, and reported drinking alcohol every day (Doc. 72-, p. 27/793). McCall was diagnosed with alcohol dependence and alcohol induced mood disorder at Axis I,[2] hypertension at Axis III, marital conflict and loneliness at Axis IV, and a GAF[3] of 55

---

[2] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

[3] The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and

at Axis V (Doc. 7-2, p. 27/793).  It was also noted that McCall was homeless (Doc. 7-2, p. 49/793), and staying at his ex-wife's house (Doc. 7-2, pp. 76-77/793), and that he needed glasses (Doc. 7-2, pp. 54-55/793).  McCall has a Bachelor's Degree in education and a teaching certification from Florida (Doc. 7-2, p. 15/793), and has worked as a coach/teacher and a bus driver (Doc. 7-2, p. 87/793).

On January 5 and 6, 2009, McCall showed poor comprehension of the nurse teaching him about his medications, and had notable memory deficits (Doc. 7-2, p. 158/793).  McCall's mental status exam on January 6, 2009 showed he was alert and oriented, he felt less angry and irritable, he denied hallucinations or delusions, but

---

occupational functioning, on a hypothetical continuum of mental health-illness.  The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year.  See DSM-IV-TR at 32-34.

The GAF scale goes from 0-100: 91-100 - superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities, no symptoms; 81-90 - absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns; 71-80 - if symptoms are present, they are transient and expectable reactions to psycho-social stressors,  not more than slight impairment in social, occupational, or school functioning; 61-70 - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; 51-60 - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; 41-50 - serious symptoms OR serious impairment with social, occupational, or school functioning; 31-40 - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood; 21-30 - behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas; 11-20 - some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication; 1-10 - persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death; and 0 - inadequate information.  See DSM-IV-TR, at 34; see also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

he continued a theme of persecution (Doc. 7-2, p. 658/793). McCall's diagnoses were alcohol abuse and alcohol-induced mood disorder at Axis I, antisocial traits at Axis II, and a GAF of 65 at Axis V (Doc. 7-2, p. 658/793).

McCall was discharged on January 14, 2009 with diagnoses of: (1) alcohol abuse and alcohol induced mood disorder at Axis I; (2) antisocial traits at Axis II; (3) allergic rhinitis and hypertension at Axis III; (4) homeless, unemployed, legal jeopardy, abundant free time, and financial stress at Axis IV; and (5) a GAF of 80 at Axis V (Doc. 7-2, pp. 76, 111-116, 374, 617/793). McCall was discharged with citalopram (Celexa), diltizem SR Cap, hydrochlorothiazide, ibuprofen, ipratropium (Atrovent), Loratadine, and potassium chloride. He had no restrictions on his physical activities, and he was considered unemployable and disabled (Doc. 7-2, p. 77, 375, 618/793).

On January 21, 2009, the mental health clinic found McCall's PTSD was 0% service connected (Doc. 7-2, p. 403/793). The Beck Depression Inventory-2 and Problem Checklist for Civilians were not administered due to McCall not meeting the criteria for PTSD, and thus not meeting the criteria for the PCT [PTSD Clinical Team] clinic (Doc. 7-2, p. 593/793). The social worker noted she would present her intake interview of McCall to the PCT at the Interdisciplinary team meeting later that month to ensure her decision was appropriate (Doc. 7-2, p. 593/793).

In February 2009, McCall had an appointment in the Mental Hygiene Clinic (Doc. 7-2, p. 594/793), and was diagnosed with alcohol abuse/dependence (Doc. 7-2, p. 601/793).

On February 28, 2009, Dr. Daniel Denison examined McCall for a state disability determination (Doc. 7-2, p. 205/793). McCall complained of headache, back pain since 2001, shortness of breath for six months (aggravated by exertion), fatigue for six months, depression since 1990, memory problems, nervousness, mood swings, paranoia, and post-traumatic stress syndrome since 2008 (when he was diagnosed) (Doc. 77-2, pp. 205-6/793). McCall said that he saw and heard things that were not there, and he was constantly nervous and afraid (Doc. 7-2, p. 206/793).

In March 2009, Dr. Linda Hartwell, Ph.D., filled out a residual mental functional capacity assessment on McCall after reviewing his medical records (Doc. 7-2, p. 226/793). Dr. Hartwell found that McCall has moderate limitations in: (1) his ability to understand and remember detailed instructions; (2) his ability to carry out detailed instructions; (3) his ability to accept instructions and respond appropriately to criticism from supervisors; and (4) his ability to set realistic goals or make plans independently of others (Doc. 7-2, pp. 227-28/793). Dr. Denison found that McCall: (1) can understand and remember simple instructions and some semi-complex instructions; (2) can carry out two-step commands and some commands of more than two steps; (3) can sustain attention for at least two hours at a time, can pace the work activities and can persist on task to the extent typically required to complete simple repetitive tasks; (4) can accept and respond appropriately to guidance and can get along with co-workers; (5) can identify and avoid hazards, and can adjust to changes in job requirements and job settings; and (6) can perform routine repetitive tasks (Doc. 7-2, pp. 228-29/793).

McCall had an initial evaluation for PTSD on January 26, 2010 with Dr. Milton S. Rhea, Ph.D. at the Alexandria VAMC (Doc. 7-3, pp. 137, 266/706).  Dr. Rhea found that McCall was in the U.S. National Guard and the Army for a total of twelve years, earning the rank of E-7, and that he was in Panama for five months (Doc. 7-3, p. 137/706).  Dr. Rhea noted that McCall indicated he saw the aftermath of fighting in Panama, he was disciplined in the National Guard for alcohol-related issues that he was vague about, and he said he stopped drinking in 1999, despite his recent diagnosis of alcohol-related problems (Doc. 703, p. 138/706).  McCall also stated that one of his brothers died of possible poisoning and both of his parents died while he was in the military (Doc. 7-3, p. 139/706).

Dr. Rhea found McCall was able to engage in a normal range and variety of activities of daily living without interruption of his typical daily routine, but McCall could not name any particular leisure activities (Doc. 7-3, p. 139/706).  Dr. Rhea stated that McCall gave very vague responses to the questions posed in his interview, his behavior was odd, he was sullen, hesitant, and seemed uneasy, his thought processes were logical, coherent and relevant, he was articulate, verbal, well-dressed, and well-groomed, he was somewhat uncooperative, his social skills were poor, he seemed intelligent, and his speech was well understood (Doc. 7-3, p. 139/706).  Dr. Rhea further found that McCall was oriented, his affect was flat, his reasoning was good, his fund of general information was good, his verbal comprehension, concentration and memory were good, and his sensorium was a little cloudy (Doc. 7-3, p. 139/706).

Dr. Rhea found that McCall endorsed every psychological symptom mentioned by him except homicidal ideas, indicating anxiety, panic, depression, insomnia, appetite disturbance, crying spells, anhedonia, nightmares, head pain, racing thoughts, an urge to get angry, vague auditory and visual phenomena, paranoia, and suicidal ideas (Doc. 7-3, p. 139/706).  However, Dr. Rhea found McCall was vague and he was unable to get a clear understanding of McCall's problems or symptoms, so he could not give any specific diagnosis from his interview and psychological testing (Doc. 7-3, p. 139/706).  Dr. Rhea did not find any mental health problems that interfered with McCall's occupational functioning or symptoms of emotional distress interfering with his social functioning (Doc. 7-3, p. 139/706).

Dr. Rhea also administered the Wechsler Adult Intelligence Scale III and estimated McCall's IQ to be within an average range (Doc. 7-3, pp. 139-40/706).  Dr. Rhea diagnosed nothing at Axis I, average intelligence at Axis II, orthopedic problems and high blood pressure at Axis III, no clear functional impairment at Axis IV, and a GAF of 70-75 at Axis V (Doc. 7-3, p. 140/706).  Dr. Rhea concluded that McCall had minimized his alcohol problem despite his clear diagnosis for that condition, he produced an exaggerated response to the Minnesota Multiphasic Personality Inventory-2, and he was vague during the interview (Doc. 7-3, p. 10/706).  Dr. Rhea was unable to give a specific diagnosis based on McCall's statement and psychological testing (Doc. 7-3, p. 140/706).

On December 3, 2010, McCall was assessed at a VAMC in Texas by Dr. Deepak Dev, M.D. (Doc. 7-3, p. 92/706).  McCall reported that he had moved there from

Louisiana and needed to get back on his meds because he was irritable, had a history of PTSD, and was depressed (Doc. 7-3, p. 92/706).  McCall reported that he was unhappy with the Alexandria (Louisiana) VAMC because they did not diagnose him with PTSD as he believed he deserved, and he wanted "compensation" (Doc. 7-3, p. 95/706).  McCall reported PTSD from seeing dead bodies and loading them into a truck when he was in Panama, and said he might have nightmares but does not remember them, is hypervigilant and mistrustful, has poor concentration, insomnia, irritability/anger, and distress with loud noises or yelling, and practices avoidance through detachment, depression, and avoiding people (Doc. 7-3, 95/706).  McCall also reported depression with poor sleep, anhedonia, low energy, poor concentration, and paranoia, but a good appetite (Doc. 7-3, p. 95-706).

Dr. Dev noted that McCall had previously been diagnosed with intermittent explosive disorder, depression, alcohol abuse, alcohol induced mood disorder, and possible antisocial traits, but PTSD had been ruled out (Doc. 7-3, p. 97-706).  McCall was assessed with symptoms of anxiety and depressive disorder, and his symptoms also appeared to suggest PTSD (Doc. 7-3, p. 99-706).  Dr. Dev also noted that McCall was adamant that he had PTSD, wanted to be involved with the Trauma/PTSD clinic, was willing to restart his medications, and had a history of alcohol abuse but was currently "keeping his consumption to within recommended limits" (Doc. 7-3, p. 99/706).  Dr. Dev found McCall had difficulty comprehending and expressing himself and was a poor historian (Doc. 703, p. 99/706).

Dr. Dev diagnosed: (1) anxiety disorder NOS, depressive disorder NOS, and a history of alcohol abuse at Axis I; (2) antisocial traits per history at Axis II; (3) chronic pain and hypertension at Axis III; (4) planned to rule out PTSD, psychosis NOS, cognitive disorder NOS, and borderline intellectual functioning (Doc. 7-3, p. 99-706); and (5) had a GAF of 45 at Axis V (Doc. 7-3, p. 109-706). Dr. Dev prescribed citalopram and mirtazapine (Doc. 7-3, p. 99-706).

McCall underwent a second PTSD evaluation with Dr. Reed J. Robinson, Ph.D., in February 2011 at the VAMC in Texas (Doc. 7-3, p. 309/706). Dr. Robinson noted that McCall was upset with the VAMC in Louisiana because he was not diagnosed with PTSD (Doc. 7-3, p. 310/706). McCall reported difficulty trusting people, pain and weakness in his right leg, problems with concentration, paranoid feelings, being bothered by intrusive noises, depression, moodiness, and difficulty sleeping (Doc. 7-3, p. 310/703). McCall explained that, if he had monetary assistance, he would feel better because he would not have so much stress, and that he had served in the military for "20 years" and had never "said no," so he was due some help (Doc. 703, p. 310/706). McCall also explained that he could not afford to drink as often as he would like, that he was drinking the same amount as he had in the past, and that he had been previously diagnosed with an alcohol problem because he was charged with a DUI in 1999 at Ft. Polk (Doc. 7-2, p. 310/706).

Dr. Robinson noted McCall's service was in the Army from 1/9/1980-5/31/1991, where he was a truck driver and a transportation specialist, and in the National

Guard from 7/1993-1/2001 (Doc. 7-3, p. 311/706).  Dr. Robinson further noted that McCall never had any war zone deployments (Doc. 703, p. 311/706).

McCall reported to Dr. Robinson that he had been exposed to combat while deployed to Panama from August 1989-January 1990 (Doc. 7-3, p. 311/706).  While in Panama, McCall was in charge of a unit of truck drivers that were charged with delivering supplies to the Army's encampments outside the city (Doc. 7-3, p. 312/706).  McCall initially told Dr. Robinson he worked on the "front line," but explained that he meant the Army's encampments outside the city (Doc. 7-73, p. 312/706).  McCall also explained the invasion was already over and his unit was responsible for cleaning up and, in the course of that, he was exposed to a number of dead civilians who were killed by the bombings during the conflict (Doc. 7-3, p. 312/706).  Dr. Robinson found that, although McCall had previously reported in an information packet that he was fired upon while in Panama, he did not report that during the interview, even when repeatedly asked if he had been exposed to any other traumatic events (Doc. 7-3, p. 312/706).  McCall said that his exposure to trauma did not affect him at the time but that, later, he began to think about "what could he have done to help those people" (Doc. 703, p. 312/706).  McCall was not diagnosed or treated in the service for PTSD (Doc. 7-3, p. 313-706).  McCall denied any post-military trauma exposures (Doc. 703, p. 313/706).

McCall also told Dr. Robinson that, after the military, he drove a truck for six months, "got bored," coached for six months but "got bored" again, drove a truck again for six months, and followed that pattern until 2005 (Doc. 7-3, p. 313/706).  McCall

then drove a school bus from 2006-2008, until he lost that job due to incarceration (Doc. 7-3, p. 313/706). McCall was incarcerated for discharging a firearm into the door of his girlfriend's home, explaining that he thought she was being attacked, but his girlfriend did not believe him, got a restraining order against him, and charged him with felony destruction of property (Doc, 7-3, p. 313/706).

McCall told Dr. Robinson that he could not afford leisure activities, but if he could, he would to go track meets, watch TV, and go fishing (Doc. 703, p. 313/706). Dr. Robinson noted that McCall claimed he is financially destitute due to his perception that he is physically unable to work because of his leg problems (Doc. 703, p. 313/706).

Dr. Robinson found that McCall did not meet the PTSD stressor criterion in the DSM-IV–"[t]he person was exposed to a traumatic event in which both of the following were present: (1) the person experienced, witnessed, or was confronted with an event or events that involved action or threatened death or serious injury, or a threat to the physical integrity of self or other; and (2) the persons response involved intense fear, helplessness, or horror" (Doc. 703, p. 314/706). Dr. Robinson further found that McCall had chronic, delayed onset PTSD symptoms for more than one month: (1) difficulty falling or staying asleep; (2) irritability or outbursts of anger; (3) difficulty concentrating; and (4) hypervigilance. Dr. Robinson stated that it was notable that McCall was unable to report the vast majority of the PTSD symptoms or to relate any accounts of his daily problems or functional difficulties which would serve to indicate the presence of the symptoms. But, at the conclusion of the

interview, McCall endorsed every single symptom of PTSD when cued, reporting nearly all of them at the highest level of extremity (Doc. 7-3, p. 315/706).

Dr. Robinson also administered a psychometric test to McCall to assess the credibility of his self-report of the existence of symptoms and the severity of the symptoms reported (Doc. 703, p. 315/706). McCall's psychometric test results showed he was probably exaggerating and/or confabulating his PTSD symptoms (Doc. 703, p. 315/706). Dr. Robinson noted that McCall's distress or PTSD symptoms were probably caused by other factors, such as current life stressors (Doc. 7-3, p. 315/706). The Minnesota Multiphasic Personality Inventory-2 test showed that McCall's approach to the PTSD testing was not considered reliable, there was considerable evidence of exaggeration of symptoms, and there was an overt attempt to present as maximally ill on the test that is usually seen in individuals who are seeking secondary gain, but is sometimes seen as a "cry for help" (Doc. 7-3, p. 316/706). An inventory of symptoms of depression indicated that McCall's depression was moderate to severe (Doc. 7-3, pp. 316-317/706).

Dr. Robinson concluded from McCall's test results that he does not have PTSD, but he does suffer from depression (Doc. 73, p. 317-706). Dr. Robinson diagnosed: (1) depressive disorder NOS and probably malingering at Axis I; (2) traits of antisocial personality disorder at Axis II; (3) financial and employment problems at Axis IV; and (4) a current GAF of 80 at Axis V (Doc. 7-3, p. 318-706). Dr. Robinson stated that McCall's depression stems almost entirely from: (1) unemployment (due to perceived problems with his right leg); (2) financial problems (due to McCall's disinterest in

seeking employment); and (3) preoccupation with obtaining disability payments (Doc. 3-7, p. 318/706).

Dr. Robinson also found that McCall appeared to believe that disability support is strictly need-based, did not understand he needed to have a service-connected disorder, and rarely expressed interest in receiving therapy for PTSD (Doc. 7-3, p. 318/706). Dr. Robinson further noted that McCall refused to endorse any history of alcohol abuse despite having been in rehab and charged with a DUI (Doc 7-3, p. 318/706). Dr. Robinson found that McCall was clearly experiencing a great deal of stress from his life circumstances, and was convinced that he should be receiving disability support, which prevented him from pursuing more effective means of getting his life on the right track, such as employment (Doc. 7-3, p. 318/706). Dr. Robinson prescribed medication for depression and a sleep-aid (Doc. 703, p. 319/706).

McCall had a social work evaluation at the Alexandria VAMC in March 2011, at which he denied an alcohol problem, stated he needed housing and income (he had been staying alone at a house that was foreclosed on and he was forced to leave), and his GAF was 70 (Doc. 7-3, pp. 197-201/706). McCall had a mental health evaluation on March 8, 2011, during which he complained that Dr. Robinson had found he did not have PTSD and said he wanted a second opinion (Doc. 7-3, p. 305/706). McCall also said his medications were fine and he was not depressed (Doc. 703, p. 305/706).

In May 2011, McCall denied drinking alcohol (Doc. 7-3, p. 390/706). In June 2011, McCall reported to a social worker that he drinks beer about once a week (Doc.

7-3, p. 690/706).  In July 2011, McCall again told a social worker that he drinks about once a week, and only drinks beer (Doc. 7-3, p. 687/706).

In September 2011, McCall denied having had any alcohol in the last year (Doc. 7-3, p. 673/706).  McCall had a negative PTSD screen because he denied having nightmares, denied trying hard not to think about traumatic events or going out of his way to avoid situations that reminded him of traumatic events, and denied feeling numb or detached from others, activities, or his surroundings, but admitted he was constantly on guard, watchful, or easily startled (Doc. 7-3, p, 673/706).  A depression screen suggested that McCall had moderately severe depression (Doc. 7-6, p. 673/706).

In October 2011, McCall had a psychology evaluation by Dr. Birgit M. Smart, Ph.D. in Louisiana (Doc. 7-3, pp. 650-654/706).  McCall again denied alcohol use and dependence, his mood was dysphoric, he claimed he had visual hallucinations at times (shadows), heard voices and sounds (not commanding voices), and felt a "presence" in a room; his insight was fair, and his judgment was intact (Doc. 7-3, pp. 651-51/706).  Dr. Smart found McCall had: (1) major depressive disorder, severe with psychotic features (provisional) at Axis I; (2) financial problems and health issues at Axis IV; and (3) a GAF of 65 at Axis V (Doc. 7-6, p. 653/706).  McCall took the computerized Minnesota Multiphasic Personality Inventory-2, but Dr. Smart found the test scores showed the test was invalid and other diagnostic tools would have to be used to complete the diagnosis (Doc. 7-3, pp. 653-54/706).

In November 2011, McCall had a third PTSD assessment, this time with Dr. John L. Black, Ph.D. in Texas (Doc. 7-3, pp. 393-94, 479, 619/706).  Dr. Black noted that McCall denied having been hospitalized for suicidal ideation for 23 days in December 2008 in the Alexandria VAMC, and reported abusive drinking for only six months in 1999 (Doc. 7-3, p. 394/706).  Dr. Black also noted that McCall reported serving in Panama in 1989-90 as combat support, convoying supplies to forward areas, receiving small arms/sniper fire, witnessing serious injury/death, exposure to dead bodies/body parts, seeing a solder die from removing an IV, and picking up and transporting dead bodies (Doc. 7-3, p. 394/706).  McCall also reported non-combat traumatic events such as seeing an army truck flip over, a motor vehicle accident, his brother being murdered, loss of his family home and credit, smelling dead bodies when he worked for FEMA in New Orleans, and being attacked with a pool cue when he was growing up (Doc. 701, p. 460/483; Doc. 7-3, pp. 394-95/706).  McCall served three months in jail and two years of probation for felony destruction of property in 2008 (Doc. 7-1, p. 460/483).  McCall was homeless from January 2009-April 2011 (Doc. 7-1, p. 460/483).

Dr. Black found McCall suffers from the following PTSD symptoms that are triggered by needles and the smells of blood and raw fish: nightmares, night sweats, 4-5 hours to sleep onset, restless sleep, irritability/anger, social avoidance, discomfort if someone is behind him, startle response, emotional detachment, foreshortened sense of the future, and sitting with his back to the wall in restaurants and monitoring the exits (Doc. 7-3, p. 395, 461/607).  McCall denied any suicidal attempts

or current ideation, but reported he was hospitalized for 23 days in 2008 for suicidal ideation (Doc. 7-1, p. 460/483).

In psychological testing, McCall's score on the Quick Inventory of Depressive Symptomatology (Self-Report) was 14 (moderate range), his score on the Beck Depression Inventory was 20 (moderate/severe range), his score on the PTSD Symptom Checklist was 85 (maximum score), and his score on the Mississippi PTSD Combat Scale was 143 (indicating PTSD).   McCall's Minnesota Multiphasic Personality Inventory-2 profile was invalid, indicating symptom exaggeration, seeking secondary gain, and a "cry for help" (Doc. 7-1, p. 461/483).  A test to indicate malingering of PTSD symptoms suggested symptom exaggeration (Doc. 7-1, p. 461/483).

Dr. Black found that McCall had trauma exposure before, during and after the military, had the maximum score on the PTSD check list, his psychological testing suggested symptom exaggeration, high levels of distress, and a "cry for help," and his assessment results were consistent with PTSD and depressive disorder NOS (Doc. 7-3, p. 395/706).

In December 2011, McCall asked his primary care physician, Dr. Maria Gove, for a functional capacity evaluation that shows he is unemployable because he cannot sit or stand very long (Doc., 7-3, p. 459/706).  Dr. Gove explained he needed to get a form for her to fill out, then she would review it with him (Doc. 7-3, p. 459/706). McCall also stated that he had not had any alcohol in the past year (Doc. 7-3, p. 464/706).

On October 31, 2012, McCall had a fourth PTSD assessment with Dr. Joseph A. Lamanna, D.Ed. (Doc. 7-3, pp. 401-3, 619-630).  Dr. Lamanna diagnosed McCall with: (1) PTSD, recurrent major depressive disorder, psychotic disorder, and intermittent explosive disorder at Axis I; (2) organic impotence, hypertension, lumbar radiculopathy, spinal stenosis, rectal bleeding, hemorrhoids, degenerative joint disease, and intervertebral disc disorder with myelopathy in the cervical region at Axis II; (3) psychosocial and environmental problems (financial stress, physical illness, and social isolation) at Axis IV; and (4) a GAF of 50 at Axis V  (Doc. 7-3, pp. 401-3/706).

Dr. Lamanna found that McCall's service in Panama, where he convoyed supplies to forward areas, received small arms/sniper fire, witnessed serious injury/death, was exposed to dead bodies/body parts, saw a solder die from removing an IV, and picked up and transported dead bodies, constituted "an event that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others," and that his "response involved intense fear, helplessness or horror" (Doc. 7-3, p. 408/706).  Dr. Lamanna made the following clinical findings to support his diagnosis of PTSD:

1. McCall persistently re-experiences the traumatic event through;
(a) recurrent and distressing recollections of the event, including images, thoughts or perceptions;
(b) recurrent distressing dreams of the event;
(c) acting or feeling as if the traumatic event were recurring, including a sense of reliving the experience illusions recurrent distressing dreams of the event, acting or feeling as if the traumatic event were recurring, including a sense of reliving the experience; illusions, hallucinations, and dissociative flashback episodes, including those that occur on awakening or when intoxicated;

(d) intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event; and

(e) physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event (Doc. 7-3, p. 408/706).

2. McCall shows persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness through:

(a) efforts to avoid thoughts, feelings or conversations associated with the trauma;

(b) efforts to avoid activities, places, or people that arouse recollections of the trauma;

(c) markedly diminished interest or participation in significant activities;

(d) feeling of detachment or estrangment from others;

(e) restricted range of affect; and

(f) sense of a foreshortened future (Doc. 7-3, pp. 408-9/706).

3. McCall shows persistent symptoms of increased arousal through:

(a) difficulty falling or staying asleep;

(b) irritability or outbursts of anger;

(c) difficulty concentrating;

(d) hypervigilance; and

(e) exaggerated startle response (Doc. 7-3, p. 409/706).

Finally, Dr. Lamanna found McCall has symptoms of depressed mood, anxiety, suspiciousness, chronic sleep impairment, impairment of short- and long- term memory, circumstantial, circumlocutory or stereotyped speech, difficulty understanding complex commands, impaired judgment, impaired abstract thinking, gross impairment in thought processes or communication, disturbances of motivation and mood, difficulty adapting to stressful circumstances, including work or a work-like setting, inability to establish and maintain effective relationships, and persistent delusions or hallucinations (Doc. 7-3, pp. 409-10/706).

## 2. June 2013 Administrative Hearing

McCall has a college degree in physical education, is divorced, and has an adult son (Doc. 7-1, p. 460-483). McCall has past relevant work as a truck driver, a

23

school teacher, a truck-driving-school instructor, and a forklift operator for FEMA (Doc. 7-1, p. 460/483). At his third Administrative Hearing, held on June 25, 2013, McCall appeared with his attorney and a VE (Doc. 7-1, p. 94/483).

McCall testified that he lived in Ball, Louisiana, was 56 years old, and is right-handed, 5'10" tall, and weighs about 210 pounds (Doc. Pp. 97-98/483). McCall has been homeless since 2008, and was about to begin getting monthly income from the VA for a 100% service-connected disability (Doc. 7-2, pp. 98-99/483). McCall completed a bachelor's degree in college, completed truck driving academy training, and drives a truck (Doc. 7-1, pp. 99-100/483).

McCall testified that he was in the Army and National Guard from 1980-2001 (12 years in the Army and 8 years in the National Guard), and he was an E-7 when he left (Doc. 701, p. 100/483). McCall used to drive a school bus, but had problems getting along with the children and was reprimanded for cursing at them (Doc. 7-1, pp. 107-8/483). McCall lost that job when he was incarcerated for three months in 2007 for shooting through someone's door (Doc. 7-1, p. 108/483). McCall claimed that incident was not alcohol-related (Doc. 7-1, p. 108-483).

McCall testified that, in May 2009, an MRI of his back showed changes at multiple levels, severe facet hypertrophy, marked stenosis, and marked hypertrophy at L2-3, and an EMG showed multilevel radiculopathy in August 2009 (Doc. 7-1, p. 112/483). McCall was having problems with his neck, back and legs (Doc. 7-1, p. 112/483). McCall was able to stand or walk for three or four minutes (Doc. 7-1, p. 113/483).

McCall testified that, in November 2009, he walked into the VA crying due to emotional problems and would not talk to the nurses (Doc. 7-1, p. 113/483).   In January 2010, he went to the VA because he was having a "lot of flashback," and a lot problems coping with himself and what had happened to him in the past (Doc. 7-1, p. 114/483).   McCall testified that those problems never subsided and he still has nightmares, paranoia, and social withdrawal, and one of the reasons he has been living homeless is because of his desire to be away from people (Doc. 701, p. 114/483).   McCall gets irritable and cries every day (Doc 7-1, p. 105/483).   McCall testified that he does not have family or friends that he sees occasionally, he has one son but he does not know where he is, and he does not do anything socially such as church or veterans' organizations (Doc. 7-1, p. 105/483).

McCall testified that he worked six months in 2010 and earned $9600 (Doc. 71 p. 111/483).   McCall claimed that he stopped working that time because it was hard on him (Doc. 7-1, p. 111/483).   McCall last worked in 2011 because he did very little work in 2012.   In 2012, McCall drove trucks for Western Express and for self-employment (Doc. 701, p. 100/483).   McCall testified that he earned $5,000 in 2012, working for about six months (Doc. 7-1, p. 111/483).   McCall stopped working because he had problems with his leg, and he did not have a place to live and was staying in the truck ((Doc. 7-1, p. 101/483).   There was walking involved in that job, but he did not have to walk far or unload the truck (Doc. 7-1, pp. 101-2/483).   McCall was homeless for about three years, from 2009 to 2012 (Doc. 701, p. 109/483).   McCall admitted that he has not looked for a job since 2012 (Doc 701, p. 104/483).

McCall testified that he cannot work now because he has problems with his back, neck, and right arm, he cannot bend or lift, he has numbness in his right hand, and his night vision is bad (Doc. 7-1, p. 102/483).  After he had a cervical fusion, his voice was different and he developed numbness in his hand (Doc. 7-1, p. 102/483).  McCall testified that he can no longer drive a truck because of the problems he has with his legs, neck and back (Dc. 7-1, pp. 104-5/483).  McCall testified the doctors have not figured out why his right hand is numb and have not recommended exercises for it (Doc. 7-1, p. 107/483).

McCall carried a cane to his administrative hearing, and testified that he has used one every day since 2008 to take weight off his right side (Doc. 701, p. 103/483).  McCall testified that he could not put any weight on his right side because it gives out (Doc. 7-1, pp. 103-4/483).  His cane was prescribed by his doctor (Doc. 7-1, p. 113/483).  McCall also testified that he quit drinking and smoking around 2008 (Doc. 7-1, p. 106/483).  McCall is currently receiving mental health treatment from the VA (Doc. 7-1, p. 107/483).

The VE testified that McCall's past work as a bus or truck driver was medium work, SVP 4, DOT No. 905.663-014 (Doc. 7-1, p. 115/483).

The ALJ posed a hypothetical involving someone of McCall's age, education, and work experience, who can lift/carry 20 pounds occasionally and 10 pounds frequently, can stand/walk for six hours, sit for six hours, and have only occasional interaction with others, and is more comfortable working with things rather than people (Doc. 7-1, p. 116/483).  The VE testified that such a person could be a weigh

scale operator (DOT 929.687-050, light unskilled, SVP 2, 72,321 jobs in the United States and 997 jobs in Louisiana) or a hand-packager (DOT 920.685-018, light, unskilled, SVP 2, 363,980 jobs in the United States, 2,922 jobs in Louisiana) (Doc. 7-1, p. 116/483).

The VE further testified that, if McCall cannot stand/walk more than two hours in an eight-hour day, he cannot do the jobs the VE specified (Doc. 7-1, p. 116/483). The VE also testified that McCall cannot do the jobs he specified or drive a truck if he can only stand/walk for a total of two hours in an eight-hour day (Doc. 7-1, p. 117/783). The VE testified that McCall would not have any transferrable skills into sedentary work (Doc. 7-1, p. 117/483). ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether McCall (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

The ALJ found that, since May 6, 2009, McCall engaged in an unsuccessful work attempt from July through November 2010, and engaged in a substantial gainful activity from May 2012 to June 2013 (Doc. 7-1, p. 25/483).  The ALJ further found that McCall's disability insured status expired on September 30, 2009 and, for purposes of Medicare only, he met the insured states requirements through December 31, 2015 (Doc. 7-1, p. 25/483).

The ALJ found that, although McCall has severe impairments of degenerative disc disease of the cervical and lumbar spines, lumbar stenosis at L3-4, cervical myelopathy, depression, and PTSD, he does not have an impairment or combination of impairments that meets or equals an impairment listed in Appendix I (Doc. 7-1, p. 26-27/483).  The ALJ found that McCall is unable to do any of his past relevant work, he has at least a high school education, and he is closely approaching advanced age (52 years old on the amended alleged onset date) (Doc. 7-1, p. 35/483).  The ALJ noted that McCall was 55 years old in December 2011 and a finding of disabled would have been directed pursuant to Medical-Vocational Guideline Rule 202.06, but McCall returned to substantial gainful activity five months later (Doc. 7-1, p. 35/483).

The ALJ further found that McCall is unable to perform any past relevant work, but has the residual functional capacity to perform a modified range of light work: he can lift/carry ten pounds frequently and twenty pounds occasionally; he can stand and walk or sit for six hours in a work day; and he can have only occasional interaction with others due to emotional problems and because he is more comfortable working with things than with people (Doc. 7-1, pp. 29, 34/483).

The ALJ also found there are jobs that exist in significant numbers in the national economy that McCall could have performed in 2009 through 2013, such as weigh scale operator or hand-packager (Doc. 701, p. 35/483). The ALJ concluded that McCall was not disabled as defined in the Social Security Act at any time from May 6, 2009 (the amended alleged onset date) through September 30, 2009 (the date last insured for DIB) or through the date of his decision on December 16, 2013 (for purposes of Medicare Insurance Benefits) (Doc. 7-1, pp. 35-36/483).

Law and Analysis

The only issue McCall raised on appeal is whether the ALJ erred in his construction of the Residual Functional Capacity ("RFC") by not adding evidence of McCall's mental limitations, as documented through the Veteran Administration's determination, that McCall suffers from Post-Traumatic Stress Disorder and is 100% disabled.

A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting. Residual functional capacity is a medical assessment, based upon all of the relevant evidence, of the work a claimant can

perform despite his or her limitations.  20 C.F.R. §404.1545, §416.945.  Although the burden of proof in a disability case is on the claimant to show that he is unable to perform his usual line of work, once that fact is established, the burden shifts to the Commissioner to show that the claimant is able to perform some other kind of substantial work available in the national economy.  See Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986); see also, Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984).  The Commissioner has the burden to establish a claimant's residual functional capacity.  See Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

A VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, but it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ.  See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001).  In Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir.1981), the Fifth Circuit stated that a VA disability determination is entitled to "great weight."  The ALJ must consider both the agency's findings and the evidence underlying them.  See Kinash v. Callahan, 129 F.3d 736, 739 (5th Cir. 1997).  Failure to do so constitutes reversible error.  See Welch v. Barnhart, 337 F.Supp2d 929, 935 (S.D.Tex. 2004), citing Kinash, 129 F.3d at 739; see also S.S.R. 06-03p, "Considering Opinions and Other Evidence from Sources Who are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies."

In Chambliss, the Fifth Circuit further explained that, while the VA disability determination is entitled to great weight in most cases, the relative weight to be given

this type of evidence will vary depending upon the factual circumstances of each case. Since the regulations for disability status differ between the SSA and the VA, ALJs need not give "great weight" to a VA disability determination if they adequately explain the valid, specific reasons for not doing so. See Chambliss, 269 F.3d at 522.

McCall received a diagnosis of PTSD and 100% service-connected disability rating from Dr. Lamanna, the last VA psychologist in the administrative record that evaluates McCall.  Although both Dr. Black and Dr. Lamanna found that McCall suffers from service-connected PTSD, only Dr. Lamanna assigned McCall a 100% disability rating due to his PTSD.

The ALJ discussed McCall's PTSD and stated in his decision that he was not persuaded by Dr. Lamanna's assessment (Doc. 7-1, pp. 32-33/483):

> On October 31, 2012, the claimant secured the diagnosis of PTSD. Joseph A. Lamanna, D.Ed., a licensed psychologist at the VA Medical Center, evaluated the claimant on that date and diagnosed PTSD, major depressive disorder, psychotic disorder, and intermittent explosive disorder.  Dr. Lamanna assessed a GAF score of 50, which is at the top of the range which would suggest difficulty keeping a job.    The undersigned, however, is not persuaded of the validity of Dr. Lamanna's assessment, as a finding of disability is not entered simply because one mental health professional finally provided an assessment favorable to the claimant.  The overwhelming weight of the evidence in this case shows an individual who believes he "deserves" a diagnosis of PTSD and associated compensation for that condition.   The claimant changed providers until he was given the diagnosis and malingered on a least one evaluation in the process. The undersigned gives not [sic] weight to the GAF score assessed by Dr. Lamanna or the implied assertion that the claimant is unable to sustain employment.

Dr. Black and Dr. Lamanna appear to have accepted as true McCall's statements that he served "at the front" in Panama and received small arms/sniper fire (although the invasion was over by the time McCall arrived in

Panama), thereby finding McCall suffered service-related trauma and PTSD. It does not appear that either Dr. Black or Dr. Lamanna reviewed McCall's previous PTSD assessments and mental health history. It is also noteworthy that Dr. Lamanna did not administer the Minnesota Multiphasic Personality Inventory-2 or a psychometric test to determine whether McCall was exaggerating or confabulating his symptoms.

The ALJ rejected Dr. Lamanna's assessment and gave little to no weight to the VA's disability rating. The ALJ noted in his decision that the administrative record is replete with inconsistencies in McCall's statements (Doc. 701, p. 34/483):

> The credibility of the claimant's subjective reports are adversely affected by inconsistences in his testimony. For example, the claimant initial [sic] testified under oath that he has no income. He then acknowledged VA benefits in the amount of $2600. Given the lengths to which the claimant has gone to secure the diagnosis of PTSD and associated VA benefits, the undersigned is not persuaded that the claimant forgot that he has received those benefits. The claimant's testimony that he last worked in 2011 also undermines his credibility in this matter. He, in fact, worked from May 2012 to April 2013, with fairly significant earnings [$12,472 total], as discussed in conjunction with finding number 2, above. When questioned further regarding his work in 2012, he testified that he had worked "very little." The hearing in this case was held on June 25, 2013. The undersigned is convinced that the claimant knew that he had worked more than "a little" and that the work had only ended about two months before the hearing. After careful consideration of the evidence, the undersigned finds that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The ALJ also noted McCall's often-expressed intent to obtain "compensation" for his service in the Army and the National Guard (Doc. 7-1,

p. 32/483). McCall appears to have modified his version of his experience in Panama and his current symptoms until he obtained a service-connected PTSD diagnosis and a 100% disability rating from Dr. Lamanna at the VAMC in 2012.

McCall told Dr. Dev that he had PTSD from seeing dead bodies and loading them into a truck when he was in Panama. McCall indicated to Dr. Rhea that he saw the aftermath of shooting and killing in Panama (Doc. 7-3, p. 138/706). McCall told Robinson that he did not actually serve "at the front," but instead served the Army's encampments outside the city. Dr. Robinson found McCall arrived in Panama after the invasion was over. McCall did not tell Dr. Robinson, Dr. Rhea, or Dr. Smart that he had been subjected to small arms/sniper fire, they found he was exaggerating when he claimed to suffer to a severe degree from the entire list of possible PTSD symptoms, and they found he minimized or denied his previous problem with alcohol abuse. It appears that McCall did not add the information about being subjected to small arms/sniper fire until he had his last two PTSD evaluations, with Dr. Black and Dr. Lamanna.

The ALJ clearly considered the VA's last disability decision and all of the underlying evidence, and adequately explained his reasons for refusing to follow the VA's rating of 100% disability for PTSD. The ALJ properly determined the credibility of the medical experts, weighed their opinions, and gave more weight to Dr. Robinson's and Dr. Hartwell's assessments.

Therefore, the ALJ did not err as a matter of law in failing follow the VA's disability rating. See Smith v. Colvin, 2015 WL 5541217, *8 (S.D. Miss. 2015); Denney v. Colvin, 2014 WL 169647, *12 (N.D. Tex. 2014).

McCall also contends the ALJ failed to consider his mental limitations in determining his residual functional capacity, pointing to his limitation in social functioning. However, the ALJ considered McCall's emotional problems and found he can have only occasional interaction with others because he is more comfortable working with things than with people (Doc. 7-1, p. 29/483). McCall has not pointed to any other specific limitation caused by his mental limitations that the ALJ failed to include in McCall's residual functional capacity assessment. Therefore, the ALJ did not fail to consider McCall's mental limitations.

Since substantial evidence supports the ALJ's decision to find McCall is not disabled, McCall's appeal should be denied and dismissed with prejudice.

<u>Conclusion</u>

Based on the foregoing, IT IS RECOMMENDED that McCall's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have **fourteen (14)** days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14)** days after being served with a copy thereof. No other briefs (such as supplemental objections, reply

briefs etc.) may be filed.  Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana on this ___ day of August 2016.

Joseph H.L. Perez-Montes
United States Magistrate Judge